UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VCA CENVET, INC., d/b/a          )
ANTECH DIAGNOSTICS,              )
                                 )
          Plaintiff,             )     CIVIL ACTION NO.
                                 )     11-12123-DPW
v.                               )
                                 )
WINCHESTER VETERINARY GROUP,     )
INC.,                            )
                                 )
          Defendant.             )

FINDINGS OF FACT AND CONCLUSIONS OF LAW
August 31, 2015

Plaintiff CVA Cenvet, Inc., doing business as Antech

Diagnostics ("Antech"), is a national provider of veterinary

laboratory services.  Winchester Veterinary Group ("Winchester")

operates a veterinary hospital in Winchester, Massachusetts.

Antech brought this action against Winchester, alleging breach

of contract of the Antech Diagnostics Service Agreement (the

"Agreement") for veterinary reference lab services it had with

Winchester.  For its part, Winchester initially brought numerous

counterclaims against Antech, but those counterclaims have since

been dismissed.[1]

---

[1]  The parties engaged in arbitration concerning the quality of
services provided by Antech to Winchester in accordance with
Section 1.1.4 of the Agreement, discussed further below.
Winchester's counterclaims against Antech focused on an alleged
breach by Antech due to inferior quality services.  After
considering extensive evidence and testimony, the arbitrator
found that Antech had provided services to Winchester that were

By agreement of the parties, the sole issues remaining to
be determined at trial were:

(a)  Whether the language of the Agreement gave Winchester
     the right to terminate by paying the Termination Fee
     set forth in Section 5 of the Agreement or otherwise
     limits the damages recoverable by Antech in the event
     of breach by Winchester;

(b)  Whether Winchester was fraudulently induced into
     signing the Agreement due to statements made to
     Winchester by Sean Hayes prior to the execution of the
     Agreement, and if so, whether Winchester thereby had
     the right to terminate the Agreement by paying the
     Termination Fee set forth in Section 5 of the
     Agreement or whether the damages Antech may seek for
     breach of the Agreement by Winchester are thereby
     limited to the Termination Fee set forth in Section 5
     of the Agreement;

(c)  The amount of damages, if any, suffered by Antech; and

(d)  The amount of specific damages, if any, that
     Winchester is required to pay Antech for Winchester's
     retention of the x-ray equipment supplied under the
     Agreement.

Following a non-jury trial regarding those issues, I set

forth in this Memorandum and Order findings of fact and

conclusions of law pursuant to Rule 52 of the Federal Rules of

Civil Procedure.  My findings of fact reflect resolution of

questions of credibility presented by the evidence at trial.

## I. FINDINGS OF FACT

Antech provides veterinary laboratory services to over

---

equal or superior to other similar veterinary laboratories and
that Antech was therefore not in breach of its warranty under
the Agreement.

16,000 animal hospitals throughout North America by means of a
network of more than fifty reference laboratories in the United
States and Canada.  Winchester is a Massachusetts-based
veterinary practice, which was co-owned by Dr. Stephen Zanotti
and Dr. Jonathan Diehl until Dr. Diehl's death in October 2013.

**A.  *Negotiation and Execution of the 2009 Services Agreement***

Before Winchester entered into the Agreement with Antech in
the fall of 2009, it sent its laboratory tests primarily to
Antech's main competitor, IDEXX Laboratories.  During the years
prior to Winchester's Agreement with Antech, Winchester had
transferred its business between IDEXX and Antech numerous
times.  IDEXX and Antech competed with each other on price for
Winchester's business and both companies provided Winchester
with special pricing that amounted to a substantial discount off
list prices.

In the summer of 2009, Winchester began discussions with
representatives of Sound Technologies, Inc., d/b/a Sound-Eklin,
regarding the purchase of digital x-ray equipment.  Sound-Eklin
is a subsidiary of VCA Cenvet, as is Antech.  Winchester had
been introduced to Gary Britko of Sound-Eklin through Peter
Massuzo, a representative of Heska Corporation, with whom Dr.
Zanotti and Dr. Diehl were discussing upgrading blood testing
equipment.  Britko connected Winchester to an Antech
representative named Sean Hayes to see whether Antech could

3

provide Winchester with the x-ray equipment in exchange for a contract for laboratory services with Antech.

Between September 10 and September 17, 2009, there was a series of conversations and communications between Hayes and Doctors Zanotti and Diehl.  Hayes provided a written proposal and then a draft services agreement to Winchester during that period.  Under the draft, Winchester would be required to use Antech for laboratory services equal to an annual minimum of $72,000, which would be $6,000 per month on average.  The draft required Winchester to use Antech for all of its laboratory and diagnostic services, with the exception that Winchester could use another laboratory for up to 10% of the fees it paid in any year as well as for any services that Antech did not provide.

During the negotiations, Winchester agreed to the general terms but requested a number of changes to the draft agreement. These included allowing Winchester an additional year to make up the minimum purchases owed if they did not meet the full $360,000 minimum commitment within the sixty-month period, adding an additional sentence to clarify that Winchester could buy the equipment for one dollar if they paid a termination fee pursuant to Section 5 of the Agreement, upgrading the x-ray equipment to a larger plate size, adding a bulk rebate in line with what IDEXX had provided them, and capping any annual price increase at 6.5%.  Antech agreed to each of these proposed

4

changes.  The Agreement, executed by the parties on September

17, 2009, stated that the term of the agreement was sixty

months, beginning September 15, 2009.

Section 1.1.4 of the Agreement, titled Laboratory Services,

states:

> Antech warrants that the Laboratory Services provided
> to the Animal Hospitals hereunder will be of a quality
> equal or superior to other similar veterinary
> laboratories.  In the event that an Animal Hospital is
> not satisfied with the quality of Laboratory Services
> provided by an Antech Lab, Animal Hospital Owner shall
> provide written notice to Antech setting forth its
> concern in reasonable detail.  Antech shall have
> thirty (30) days from receipt of such notice to
> respond to Animal Hospital Owner's concern and to make
> any necessary changes with respect to its provision of
> Laboratory Services.  In the event the response of
> Antech, including the changes implemented if any, is
> not reasonably satisfactory to Animal Hospital Owner,
> the parties hereto shall submit the issue to
> arbitration.

Section 5 of the Agreement, titled Termination and

Termination Fee, states:

> If (i) Animal Hospital breaches the exclusivity
> provisions set forth in Section 1 hereof; or (ii)
> Animal Hospital fails to pay invoices for Laboratory
> Services provided hereunder within thirty (30) days
> following notice thereof from Antech; or (iii) Animal
> Hospital is otherwise in material breach of the terms
> and provisions hereof, then Antech may Terminate this
> Agreement upon written notice to Animal Hospital.  If
> Antech elects to Terminate this Agreement due to (i)
> the breach of exclusivity set forth in Section 1
> hereof or (ii) as a result of Animal Hospital failing
> to pay invoices for Laboratory Services provided
> hereunder within thirty (30) days following notice
> thereof or (iii) due to Animal Hospital being
> otherwise in material breach of the terms and
> provisions hereof then Animal Hospital owners shall

pay a Termination Fee equal to $72,000 if Termination
of this Agreement occurs prior to the 1st anniversary
date of this Agreement, $57,600 if Termination of the
Agreement occurs between the 1st and 2nd anniversary
date of this Agreement, $43,200 if Termination of the
Agreement occurs between the 2nd and 3rd anniversary
date of this Agreement, $28,800 if Termination of the
Agreement occurs between the 3rd and 4th anniversary
date of this Agreement, and $14,400 if Termination of
the Agreement occurs between the 4th and 5th anniversary
date of this Agreement.  In addition to the
Termination Fee owed, all fees for services previously
provided by ANTECH remain due and payable.  The
Digital Radiography equipment may be purchased for
$1.00 in addition to the termination fee.

The chronology of the in-person meetings between the

parties and their principals is not entirely clear from the

evidence, but it is undisputed that there were at least two in-

person meetings during the week of negotiations.  At a September

10, 2009, meeting, Hayes stated in words or substance that

Section 1.1.4 was added based on Winchester's request, and said

"we guarantee the quality of service" and "we don't want to keep

you if you're not happy.  If you're not happy, you can go; we're

not going to force you to stay with us."[2]

---

[2]  This statement is drawn from the testimony of Dr. Diehl in
arbitration, the transcript of which was admitted at trial
before me.  I note that Winchester also contended that Dr.
Diehl's notes taken at the September 10, 2009, meeting should be
admitted as a business record kept in the course of a regularly
conducted activity of a business under Fed. R. Evid. 803(6).
These records do not fit within the business record exception
because there was insufficient evidence that this note-taking
was part of a regularly conducted activity.  Although Dr.
Zanotti and Dr. Diehl had previously met with vendors, the
evidence did not show that they regularly engaged in contract
negotiations.  In fact, Winchester had never previously

Another face-to-face meeting between the doctors, Hayes, Lori Sachs (also of Antech), Britko, and Massuzo occurred on September 17, 2009.  In this meeting, Hayes and the doctors reviewed the terms of the draft services agreement.  They specifically focused on Section 1.1.4, concerning the warranty of quality, and Section 5, concerning the termination fee. While Dr. Zanotti and Hayes were discussing Section 5, Dr. Zanotti said to Hayes something to the effect of, "So I understand the contract correctly, if Winchester Vet Group decides to leave in the first year that we owe you 72,000, and if we elect to leave in the second year, we owe you 57,600, and so on, as defined by the termination fee."  He testified that Hayes said "Yes" in response to the question.  There was conflicting evidence about whether Dr. Zanotti specified that

---

negotiated a service agreement with a laboratory service provider.  Dr. Zanotti did not testify that Dr. Diehl regularly took notes, although he did state that he did so "more often than not".  Dr. Diehl was not tasked with documenting these meetings, *cf. Hoselton* v. *Metz Baking Co.*, 48 F.3d 1056 (8th Cir. 1995) (permitting notes taken by an accountant during a meeting in part because notes were prepared out of duty to his client).  This was a single page of notes taken at only one point during the contract negotiation, and was not a standardized practice or one made over long periods of time. *Cf. In re Japanese Elec. Prods. Antitrust Lit.*, 723 F.2d 238, 288-93 (3d Cir. 1983)(*rev'd on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574 (1986))(permitting diary entries kept as regular practice and made over long periods of time about recurring meetings).  I do not therefore consider them as evidence before me.

the payments would be for the x-ray machine[3] or whether he asked whether the payments would be owed generally.  Neither Dr. Zanotti nor Dr. Diehl claimed to remember the exact wording, but both stated that they understood Dr. Zanotti's question and Hayes' answer to reflect the two doctors' pre-existing understanding that Section 5 outlined costs to Winchester if Winchester chose to return to IDEXX. There was no evidence that Dr. Zanotti specifically asked whether the amounts in Section 5 would be all that were owed or whether he asked if Winchester could pay the termination fee and unilaterally terminate for any reason.

The parties communicated again by email later on September 17, 2009, after which Dr. Diehl and Dr. Zanotti signed the final version of the Agreement and faxed it to Sean Hayes at Antech.

**B.   *Winchester's Non-Performance***

Winchester ordered laboratory services from Antech from September 2009 through the end of February 2011.  However, even during that period, Winchester spent significantly below its minimum commitment; in fact, Winchester reached its $6,000 monthly average minimum only once during that time.  On February

---

[3]   Dr. Diehl, in his deposition, recounted Dr. Zanotti's statement as being "So my understanding is that if we elect to leave within the first year, we owe you $72,000 for the X-ray machine.  If we elect to leave during the second year, we owe you $57,600 for the machine, et cetera," and that Hayes replied "Yes."

4, 2011, Winchester signed a contract for laboratory services
with IDEXX.  At the time that Winchester made this switch, it
harbored the belief that the cost of leaving Antech under the
Agreement would be the termination fee set forth in Section 5 of
the Agreement.  On March 1, 2011, Winchester called Antech's
courier service, which had been coming by to pick up laboratory
samples every day, and told the courier to only come when
Winchester called to schedule a pickup.

## C.   *Discussions after Antech's Non-Performance*

Kathryn Williams, a Territory Manager for Antech assigned
to the New England area, received a call from the courier
service on or about March 14, 2011, stating that Winchester had
told the courier to stop the regular pickups.  Williams and
Hayes were in communication as of that date about Winchester's
not sending its laboratory work to Antech.  They had numerous
meetings with Dr. Zanotti and Dr. Diehl between March 2011 and
October 2011.  Throughout those meetings, Doctors Zanotti and
Diehl never told them that they were unhappy in any way with
Antech's services.  Instead, Winchester repeatedly stated that
Massachusetts Veterinary Referral Hospital, a hospital to which
Winchester referred many patients, used IDEXX and that they
wanted continuity in results between the two medical providers.
Despite having earlier signed a contract with IDEXX, Winchester

told Antech as late as August 25, 2011, that it was under no legal obligation to use IDEXX.

Williams testified that in the August 25, 2011, meeting, Dr. Zanotti stated his opinion that Section 5 limited Winchester's liability to the prorated amount of the x-ray equipment.  Hayes did not agree, but rather said that Winchester would be liable for the revenue for the laboratory services on the balance of the Agreement.

On October 7, 2011, Williams received a voicemail from Dr. Diehl stating that although Winchester had been happy with Antech, they would be using IDEXX due to the continuity concerns related to Massachusetts Veterinary Referral Hospital.  Dr. Diehl offered to pay Antech the "pro-rated" equipment fee plus one dollar.

## D.    *Damages*

Brian Brown, the Controller of Antech, testified as to the damages calculations.[4]  I received his testimony under Rule 701 of the Federal Rules of Evidence, permitting a lay witness to testify to an opinion that is rationally based on his

---

[4] Winchester moved to exclude testimony by Brown and related exhibits about calculations of damages that deduct only variable and not fixed costs (Dkt. No. 169).  The motion is based on the claimed preclusive effect of *VCA Cenvet, Inc.* v. *Chadwell Animal Hospital, LLC*, 552 Fed.Appx. 217 (4th Cir. 2014).  As discussed further below, *infra* section II.C.3.a, however, *Chadwell* does not have preclusive effect here.  Winchester's motion to exclude Brown's testimony on this basis is therefore denied.

perception.  The Advisory Committee Notes to Rule 701 explain
that most courts permit an officer of a business to testify to
the value or projected profits of a business based on "the
particularized knowledge that the witness has by virtue of his
or her position in the business."  Brown is such a witness and
his testimony was based on his review of Antech's financial
records.

Brown has held the position of Controller since 2013, and
had previously been the Assistant Controller since 2008.  In his
role as Controller, he oversees Antech's accounting including
billing, accounts payable, internal financial statements and
management reports, and the accounting and administrative
aspects of services agreements between Antech and its customers.
Any damages calculations performed by Antech during this
litigation were either performed by or reviewed by Brown in his
role as Controller.

Brown presented a report, based on Antech's financial
records, showing Antech's yearly net revenue from Winchester
from 2009-2011.  This net revenue reflected both the discounts
and rebates that Antech provided Winchester pursuant to the
Agreement.  The net revenue that Antech received from Winchester
was $14,136 in 2009, $57,683 in 2010, and $9,707 in 2011.  This
revenue composed a small portion of Antech's yearly revenue—
0.005% in 2009, 0.019% in 2010, and 0.003% in 2011.

11

Brown testified that he conducted an analysis of Antech's
lost profits as a result of Winchester's breach.  He attempted
to determine what Antech's costs would have been to produce the
services if the contract had been fulfilled.  Because Antech did
not need to expend those costs, they had to be subtracted from
the anticipated revenue in order to determine lost profits, not
merely lost revenue.  Brown distinguished between fixed costs
that would not change regardless of whether Winchester performed
under the Agreement, and variable costs, meaning costs that were
higher or lower depending on whether Antech was fulfilling
Winchester's committed purchase volume pursuant to the
Agreement.  He testified that Winchester's business had no
impact on the staffing levels or hours of operation of any
laboratory, and that Antech did not purchase or sell any
equipment, open or close any laboratories, or make any changes
to its business to accommodate the gain or loss of Winchester's
business.  Therefore, costs like rent, equipment, and salaries
were classified as fixed costs.  Other costs were classified as
variable costs, for example, consumable materials used in tests
and the costs of transportation.  Because Antech did not have
data individualized for the Winchester Agreement specifically,
Brown looked to cost data for the company as a whole.

Brown and Bruce Bargmann, the Vice President of Finance and
Administration at Antech, conducted a detailed analysis

12

determining whether costs in each of a large number of highly specific cost categories were "fixed" or "variable" during 2009-2012.  Brown testified about the reasoning behind whether a number of these cost categories were determined to be fixed or variable costs.  Brown determined that variable costs represented 30.6% of Antech's total 2012 United States laboratory services revenue.  In previous years, total variable costs as a percentage of total revenue had been 28.6% in 2009, 29.3% in 2010, and 30.1% in 2011.

Based on this data for the company as a whole, Brown next applied it Winchester specifically.  The number that he used was the total price of services that Winchester had committed to over the course of the Agreement ($360,000), minus the amount Winchester had already paid ($81,526.42), resulting in expected net revenue over the remainder of the agreement of $278,473.58.  He then subtracted the variable costs, which he calculated based on the company-wide data as being as being 30.6% of the net revenue ($85,212.92).  This resulted in a lost profits calculation of $193,260.66.

Brown acknowledged that there are numerous assumptions built into his expectation damages model.  He testified that determining the costs specifically attributable to Antech would require a tremendous investment of time and resources, and that Antech does not have the technological capacity to do so at this

time.  Brown agreed that the major assumption that is built into
his lost profits model is that the percentage variable costs
necessary to service Winchester would be in line with the
company average, and that this percentage does not materially
change from client to client.

Brown testified, however, to ways in which Winchester was
not an average client.  He stated that Winchester was three
times larger than Antech's average client.  He testified that
Winchester received approximately a 65% discount off list price,
whereas the average discount for all clients was 45% off list
price and 51% for clients in contracts.  Brown testified that he
did not take the larger percentage discount provided to
Winchester or potential economies of scale for larger clients
like Winchester in areas like transportation into account when
he calculated lost profits.

Brown also testified that in the early stages of
litigation, he had calculated Antech's lost profits by deducting
both variable and fixed costs from expected revenue so long as
they were direct costs.  He later changed the methodology by
which he calculated Antech's lost profits, deducting only
variable costs and not fixed costs, even when the fixed costs
were for things like salaries and equipment without which it
would be impossible to service Winchester.

14

In addition to Brown's testimony about lost profits, he also testified that Antech provided Winchester with numerous discounts and rebates.  While Antech purchased $81,526.42 in services, the list price for those services was $233,465.45.  The difference between those two prices, $151,939.03, is the value of discounts and rebates that Antech provided Winchester on the services that Winchester purchased.

Dr. Zanotti testified that that the discounts and rebates they received from Antech were designed to match those that they were already receiving from IDEXX and were in line with past discounts provided by Antech in the absence of a contract.  Dr. McCammon, an Antech customer and head of another veterinary practice, testified that he too regularly received significant discounts from Antech.[5]

## II. CONCLUSIONS OF LAW

The parties agree that under Section 6 of the Agreement California law governs Antech's claim for breach of contract.

---

[5] Winchester presented testimony by Dr. McCammon about his own relationship with Antech as well as his experience in negotiating a contract with Antech.  Antech moved (Dkt. No. 162) to exclude Dr. McCammon's testimony.  I am granting the motion in part and denying it in part.  I am excluding Dr. McCammon's testimony as to the contract negotiations and as to Dr. McCammon's interpretation of contract provisions as irrelevant to this action.  I am considering his testimony as to his receipt of discounts from Antech as some evidence related to the value of the discounts and rebates provided by Antech for purposes of calculating reliance-based damages.

Under California law, the elements of this cause of action are (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oases W. Realty, LLC* v. *Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) (citing *Reichert* v. *General Ins. Co.*, 442 P.2d 377, 381 (Cal. 1968)). Winchester disputes the validity of the Agreement, arguing fraudulent inducement. Assuming, however, that a valid contract was entered into, the primary dispute is one of damages. Winchester argues that Section 5 of the Agreement functions as a liquidated damages clause and alternatively that Antech is estopped from collecting more than the termination fee laid out in Section 5. If Section 5 does not control the question of damages, Winchester acknowledges that lost profits or reliance damages are the proper method of analysis but disputes Antech's calculations.

## A.  *Extrinsic Evidence in Contract Interpretation*

A preliminary issue, relevant to a number of the conclusions set forth below, is the question of what, if any, role extrinsic evidence, such as Hayes's statements, may play in determining the intention of the parties and interpreting the Agreement. A "well-established principle mandates that unambiguous contracts be enforced according to their terms." *Hyundai Am., Inc.* v. *Meissner & Wurst GmbH & Co.*, 26 F.Supp.2d

1217, 1219 (N.D. Cal. 1998).  The test for admissibility of extrinsic evidence in interpreting a written document under California law "is not whether [the written document] appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co.* v. *G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968).  The fact that there is an integration clause, as there is in this Agreement, does not alter the applicable rule that extrinsic evidence can be used to resolve contractual ambiguity.  *Lonely Maiden Prod., LLC* v. *Golden Tree Asset Mgmt., LP*, 135 Cal. Rptr. 3d 69, 75 (Cal. Ct. App. 2011).

California law requires that I consider whether the proffered extrinsic evidence helps reveal either a patent ambiguity, apparent on the face of the contract, or a latent ambiguity.  I must therefore preliminarily consider all credible external evidence, including Hayes's statements in the context of negotiation and discussion of the Agreement, and then consider whether the language of the contract "in the light of all the circumstances is fairly susceptible of either one of the two interpretations contended for." *Burch* v. *Premier Homes, LLC*, 131 Cal. Rptr. 3d 855, 865 (Cal. Ct. App. 2011)(internal quotation marks omitted).  Where external evidence would "flatly contradict express terms of the agreement," however, external

17

evidence must be rejected.  *Thrifty Payless, Inc.* v. *Mariners Mile Gateway, LLC*, 111 Cal. Rptr. 3d 173, 182 (Cal. Ct. App. 2010).

Applying this analysis, I conclude that while Section 5 of the Agreement does give Antech the right to terminate, it *does not* give that right to Winchester.  The Section includes language that "Antech may Terminate this Agreement" if Winchester is in material breach and the language that the fee schedule applies "[i]f Antech elects to Terminate this Agreement."  Even taking into account the conversations between Hayes and the doctors prior to their signing the Agreement, this section is not susceptible in any way to a reading either that Winchester also had a right to terminate the Agreement or that under this Section Antech was constrained to only exercising its right to the termination fee in the event of a breach.

**B.   *Validity of the Agreement — Fraudulent Inducement***

Winchester argues that the Agreement itself is invalid because Winchester was fraudulently induced into signing the Agreement due to Hayes's statements.  The doctors testified that if they had understood they would be liable for damages measured by Antech's lost profits under the contract, they would not have entered into this contract.[6]

--------

[6]  While this case generally is analyzed under California law given the choice of law provision in the contract, a claim that

To prove fraud in the inducement, a party "must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to her damage." *Masingill* v. *EMC Corp.*, 870 N.E.2d 81, 88 (Mass.

---

a contract was fraudulently induced is not necessarily governed as a general proposition by a contractual choice of law clause. *See Northeast Data Sys., Inc.* v. *McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 611 (1st Cir. 1993)(choice of law clause concerning rights and obligations of the contract does not control when a claim concerns the validity of the formation of the contract itself).

Here, the choice of law provision in Section 6 of this Agreement does not limit itself to obligations or performance under the contract. Rather, it says that California law should be applied "both as to validity and performance." Whether such a choice of law provision should control a fraudulent inducement claim has been answered differently by certain of my colleagues. *Compare, e.g.*, *Computer Sales Int'l, Inc.* v. *Lycos, Inc.*, 2005 WL 3307507, *2 (D. Mass. Dec. 6, 2005) (Zobel, J.) (holding that choice of law clause does not apply when analyzing the validity of the contracts *formation*) with *Neuro-Rehab Assocs., Inc.* v. *Amresco Comm. Fin., L.L.C.*, 2006 WL 1704258, *9 (D. Mass. June 19, 2006) (O'Toole, J.) (holding choice of law clause referencing "validity" of contract did apply to inducement-based claims). A definitive answer to the question is not material in this case, because California law contains a cause of action for promissory fraud, similar to Massachusetts' law of fraudulent inducement, which addresses fraudulent inducement to enter a contract. *Lazar* v. *Superior Court*, 909 P.2d 981, 984 (Cal. 1996)(requiring "(a)misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."). For their part, both parties look to Massachusetts law for their discussion of this issue. Under the circumstances, I will analyze the issue of validity under Massachusetts law with the understanding that the analysis would be similar under California law.

2007)(citing *Kilroy* v. *Barron,* 95 N.E.2d 190 (Mass. 1950)).
Under Massachusetts law, fraud claims are subject to the
ordinary preponderance of the evidence standard.  *Compagnie De
Reassurance D'Ile de France* v. *New England Reinsurance Corp.*, 57
F.3d 56, 72 (1st Cir. 1995)("under applicable Massachusetts law
fraud need not be shown by anything more than the ordinary
preponderance of the evidence standard applicable to civil cases
in general").

     The plaintiffs claim that Hayes made two
misrepresentations: his statement on September 10, 2009,
regarding Antech's likely response if Winchester were "not
happy," and his affirmative answer to Dr. Zanotti's question on
September 17, 2009, about whether Winchester would owe Antech
the amounts detailed in Section 5.

     I conclude that Hayes's September 10, 2009, statement about
Antech's anticipated response if Winchester were "not happy" is
the kind of "general, rosy affirmation," that falls within a
category of "company representations [that] are 'normal
commercial puffing' and thus inactionable statements of
opinion."  *NPS, LLC* v. *Ambac Assur. Corp.*, 706 F.Supp.2d 162,
171 (D. Mass. 2010).  It is essentially a salesman's endorsement
that cannot be considered an actionable misrepresentation upon
which to found an argument for fraudulent inducement.

As to Hayes's statements to Dr. Zanotti about the termination fee, the primary question is one of reasonable reliance.  Parties asserting fraudulent inducement "must show that their reliance on the alleged misrepresentation was reasonable".  *Celtic Dev. Corp*. v. *F.D.I.C.*, 836 F.Supp. 926, 939 (D. Mass. 1993). "It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract."  *Masingill* v. *EMC Corp.,* 870 N.E.2d at 89; *see also Sands* v. *Ridefilm Corp.*, 212 F.3d 657, 665 (1st Cir. 2000)("It was unreasonable for the plaintiff to rely on the alleged oral representations because of the express written word.").

I conclude it was unreasonable for Winchester to rely on any statement suggesting that *Winchester* had the ability to invoke the termination fee schedule pursuant to Section 5 of the Agreement unilaterally and without any preconditions and thereby to limit Antech's damages remedy.  The language of Section 5 specifies that it applies only to Antech's decision to terminate after a breach by Winchester.  Whether the alleged misrepresentation is viewed as being about a right to terminate or as a right to limit Winchester's liability in the case of a breach, the issue is the same: Does the statement I have found that Hayes made directly contradict the language of Section 5?

21

As discussed above, Section 5 unambiguously provides a right of termination only to *Antech*, not to Winchester, and gives Antech the *option* to terminate and receive a set fee as laid out in the termination fee schedule if Winchester breaches the Agreement.  Dr. Zanotti's understanding of Hayes's affirmative answer in response to the question about what Winchester would owe if it left was rooted in interpreting the language of Section 5 itself, not in a discussion about some understanding outside the Agreement.  For example, Dr. Zanotti stated that he believed that the cost of leaving would be the termination fee from Section 5 "because of the language of Section 5 of the Services Agreement and also because of the discussion that I had with Mr. Hayes on the day that we signed the Services Agreement where he represented that my understanding of the operation of Section 5 was correct."  Yet Section 5 plainly does not provide that Winchester is entitled to pay the termination fee and get out of the Agreement without further damages.  Therefore, to the extent that Winchester relied on a response by Hayes that Winchester understood to mean that Section 5 said otherwise, the response was directly contradicted by Section 5 and Winchester's reliance on that statement was unreasonable.  Consequently, I conclude that Winchester's fraudulent inducement affirmative defense fails.

22

**C.    *Damages***

Given the existence of a valid contract, performance by Antech, and breach by Winchester, the remaining issue is that of damages.

1.    Liquidated Damages

While Winchester agrees that the text of Section 5 does not actually give it the right to terminate the Agreement, Winchester contends that Section 5 of the Agreement — interpreted in the context of statements made by Hayes — limits Antech's recovery to the termination fee schedule.  I conclude that nothing in Section 5 precludes Antech's choice to pursue a damages remedy other than that laid out in the section.  The language of Section 5 provides Antech the option whether or not to seek damages separate from the termination fee schedule of Section 5.  In particular, I note the language that "Antech *may* Terminate this Agreement" if Winchester is in material breach and the language that the fee schedule applies "[*i]f Antech elects* to Terminate this Agreement." (emphasis added).  A contract need not have a separate clause explicitly stating that one party is permitted to take a breaching party to court or that such a party may rely on common law remedies in order for a party to bring suit.  That said, language of Section 5 unambiguously maintains such options for Antech upon breach by Winchester.

2.    <u>Estoppel</u>

Equitable estoppel requires proof that the party to be
estopped had knowledge of the pertinent facts and intended his
conduct to be acted upon, and that the party asserting estoppel
was ignorant of the true state of facts and reasonably relied to
his detriment on the conduct of the party to be estopped.
*Berkeley Police Assn.* v. *City of Berkeley*, 143 Cal. Rptr. 255
(Cal. Ct. App. 1977).  The elements of promissory estoppel are a
clear promise that a promissor reasonably expects to induce
action or forbearance upon which the promissee reasonably
relies.  *Oracle Corp.* v. *Falotti*, 187 F.Supp.2d 1184, 1206 (N.D.
Cal. 2001).  The statement or promise must be clear and
unambiguous.  "The representation, whether by word or act, to
justify a prudent man in acting upon it, must be plain, not
doubtful or matter of questionable inference. *Certainty* is
essential to all estoppels."  *Steinhart* v. *Cnty. of Los Angeles*,
223 P.3d 57, 71 (Cal. 2010).

The statements made by Hayes were not the types of clear
and unambiguous statements that can form the foundation for an
estoppel claim.  Hayes's affirmative answer to Dr. Zanotti's
question about Section 5 was only as clear as Dr. Zanotti's
question.  Dr. Zanotti himself does not remember the precise
wording of his question and there is no evidence that Dr.
Zanotti asked his question in the sort of nuanced way that could

24

provide Winchester with a clear impression that it was permitted
unilaterally to invoke the termination clause.  Even if the
question were stated just as Dr. Zanotti testified, "if
Winchester Vet Group decides to leave in the first year that we
owe you 72,000, and if we elect to leave in the second year, we
owe you 57,600, and so on," that question does not clearly refer
to Winchester leaving and invoking the termination fee
unilaterally — instead, in the context of discussing the text of
Section 5, it could just as easily have been understood to be a
question about what would happen if Antech terminates after
Winchester leaves in the first or second year or a discussion of
the value of the equipment itself rather than of the entire
contract.  Given the ambiguity in any of the versions of the
question that Dr. Zanotti asked, reliance on the affirmative
response by Hayes would be reliance on an indefinite or unclear
statement.  *See Armstrong* v. *Rohm & Haas Co.*, 349 F.Supp.2d 71,
81-82 (D. Mass. 2004)("Reliance is not reasonable where the
alleged representations are vague or indefinite.")(quoting *Saxon
Theatre Corp. of Boston* v. *Sage*, 200 N.E.3d 241, 244 (Mass.
1964)).

Hayes's statement about Winchester's being able to leave if
they were "not happy" is a similarly elusive statement that
could not provide a foundation for reliance.  It was a general,

salesman-like statement rather than a concrete representation about Antech's intentions.

More fundamentally, as with fraudulent inducement, I conclude that it would be unreasonable to rely on an oral statement made during negotiations that is contradicted by the plain terms of a written agreement.  "A party may not, as a matter of law, reasonably rely on an oral promise that contradicts the plain terms of a written agreement." *Sussex Fin. Enterprises, Inc.* v. *Bayerische Hypo-Und Vereinsbank AG*, 460 F. App'x 709, 712 (9th Cir. 2011)(citing *Hadland* v. *NN Investors Life Ins. Co.*, 30 Cal. Rptr. 2d 88, 95 (Cal. Ct. App. 1994)).  Hayes's statements to Dr. Zanotti about the termination fees concern the language of Section 5 itself.  Given that there is a written, signed agreement by the parties, the unambiguous language of the Agreement itself — which allows Antech to exercise, or not, its right to the termination fee — controls.

If testimony suggested that Hayes had made a statement or promise consistent with Section 5, reliance upon it may not have been unreasonable.  For example, if Hayes had said that Antech promises to exercise its option to receive only the termination fee in the event of a breach, then that would have been consistent with the language of Section 5 and resolving the question whether reliance was reasonable would be more difficult.  *But cf. Sussex Financial Enterprises*, 460 Fed.Appx.

at 712 (where a written agreement specifies that one company can
unwind a loan for any reason, it was unreasonable for another
company to rely on an assurance that it would only do so for
specified reasons).  However, I need not explore whether a
representation or promise about Antech's intent could reasonably
be relied on here, because the evidence adduced at trial does
not support that Winchester was relying on any representation
consistent with Section 5.  The conversations between Hayes and
the doctors concerned the meaning of Section 5 and it would be
unreasonable for Winchester to rely on a statement or promise
contrary to the language of the written Agreement.  I therefore
reject Winchester's estoppel-based arguments that Antech should
be restricted to damages in the amount of the termination fee.

    3.   <u>Lost Profits</u>

    Under California law, damages in the amount of lost profits
have long been considered an appropriate remedy for breach of
contract.  *See Grupe* v. *Glick*, 160 P.2d 832, 839 (Cal. 1945).
Damages for loss of prospective profits must be "ascertainable
with reasonable certainty."  *Id.* at 839-40.  *See also S.C.
Anderson, Inc.* v. *Bank of Am. Nat'l trust & Sav. Ass'n*, 30 Cal.
Rptr. 2d 286 (Cal. Ct. App. 1994).  A plaintiff is not, however,
required to establish the amount of its damages with absolute
precision, though it is "required to present the best evidence
of damage of which the nature of the case is capable."  *Id.*

27

### a. Net Profits and Fixed Costs

A plaintiff is entitled to net profits, not gross profits. *Dallman Co.* v. *S. Heater Co.*, 68 Cal. Rptr. 873, 879 (Cal. Ct. App. 1968).  However, where "plaintiff's expenses of operating his business are fixed and would have continued in an equal amount even if the contract had not been breached by the defendant, an award of gross profits may be allowed to the plaintiff, since, in such a situation, the gross profits involved would also constitute the net profits which the plaintiff would have earned under the agreement."  *Id.*  It is a question of fact whether particular costs will or will not be affected as a consequence of nonperformance of the contract. *Oakland California Towel Co.* v. *Sivils*, 126 P.2d 651, 652 (Cal. Dist. Ct. App. 1942).  The method of dividing expenses into categories of fixed and variable is consistent with the principle underlying the lost profits method of calculating damages, which is to determine the benefit lost as the result of the breach.  If the fixed expense would not change no matter whether the contract were performed, then the fixed costs play no role in the calculation of loss.  *See id.*

The Fourth Circuit in *VCA Cenvet Inc.* v. *Chadwell*, 552 Fed. App'x. 217 (4th Cir. 2014), a decision denying summary judgment to Antech on the basis that it only provided variable and not fixed expense information and therefore the net profits could

not be determined, is instructive.[7] *Chadwell* does not have
preclusive effect here, however, because the issues in *Chadwell*
and in this case are not identical. *Chadwell* considered the
question of "net profits" at a general level during the motion
for summary judgment stage, concluding that Antech had not
presented sufficient evidence about its total costs because it
had provided selective information about the costs to be
deducted. In contrast, here Antech is asking for lost profits
after presenting evidence at trial related to the way that it
determined "fixed" and "variable" costs, allowing me to review
whether the "fixed" costs would be affected by performance or
breach of the contract here.

The *Chadwell* court did not hold that, after trial, all
fixed costs must be deducted regardless of whether they have any
role to play in the costs that would have been incurred in
performing on the particular contract at issue. The examples of

---

[7] Winchester moved (Dkt. No. 168) for me to take judicial notice
of various filings and underlying documents submitted to the
court in the *Chadwell* case for purposes of establishing
collateral estoppel. For the reasons discussed in this section,
I find that *Chadwell* does not have preclusive effect for reasons
other than those that would be elucidated by these documents. I
have nonetheless taken judicial notice of Defendant's Exhibits
L-R. Fed. R. Evid. 201(b). I will not, however, take notice of
Defendant's Exhibit K, the lab services agreement between Antech
and Chadwell Animal Hospital, because it is altogether
irrelevant to the issues in this case. *See Kowalski* v. *Gagne*,
914 F.2d 299, 305 (1st Cir. 1990) ("federal courts may take
judicial notice of proceedings in other courts if those
proceedings have relevance to the matters at hand.")

"fixed" costs that the court held were not adequately addressed included those such as freight and delivery, *id.* at 220, which were factored in as variable costs in this case.  The focus of the *Chadwell* court's decision was on the inadequacy of the evidence of costs presented at that stage, not a principled stance that fixed costs must necessarily be deducted in a net profit calculation.  Indeed, if *Chadwell* did hold that fixed costs that were not affected by the contract or by the breach must be subtracted in calculating net profits, I would disagree with its legal analysis and decline to follow it.  *See Burruss* v. *Board of County Commrs. Of Frederick County*, 46 A.3d 1182, 1194 (Md. 2012) (declining to apply collateral estoppel where prior decision was based on incorrect interpretation of the law).  Rather, I read *Chadwell* as being consistent with the position that the true net profits must be considered in this damages calculation, and that true net profit is a question of fact.

I conclude that the costs that Brown identified as fixed expenses did not vary depending on whether Winchester performed or breached.  Those expenses did not decrease after Winchester stopped sending its business to Antech.  Antech did not need to deduct these costs to determine its net profits.  *Accord Animal Hosp. of Nashua, Inc.* v. *Antech Diagnostics*, No. 11-CV-448-LM (D.N.H. Aug. 12, 2014); *VCA Clinipath Labs, Inc.* v. *Progressive*

30

*Pet Animal Hospitals, P.C.*, 2013 WL 6152409, *4-*5 (E.D. Mich.
Nov. 22, 2013) (deducting only variable costs as "the expenses
VCA would have incurred").

> b. *Establishing Lost Profits with Reasonable Certainty*

I conclude that Antech's individualized lost profit analysis
provides a basis to establish lost profits with reasonable
certainty.  Calculating future lost profits necessarily involves
estimates and assumptions.  The question is whether Antech has
presented "the best evidence" available regarding the issue.
*S.C. Anderson*, 30 Cal. Rptr. 2d 286, 290-91.  I conclude that a
more precise individualized analysis of the costs involved in
servicing Winchester had it performed under the Agreement would
be impossible and impracticable given the current technology
used by Antech and the costs and time required to implement a
system that would be capable of more highly individuated
calculations.  California law acknowledges that "absolute
precision" need not be achieved for a lost profits analysis to
survive.  *Id.*

The use of averages based on an analysis of Antech's
financial statements constitutes the type of analysis that can
adequately form the basis of a lost profits analysis in the
absence of more precisely individualized data.  Historical data
can supply an acceptable foundation for determining future
profits.  *Sargon Enterprises, Inc.* v. *University of Southern*

*Cal.*, 288 P.3d 1237, 1254 (Cal. 2012).  This analysis is rooted in the specific amount owed under the Agreement and financial data from Antech; it is not speculative.  *C.f. Kids' Universe* v. *In2Labs*, 116 Cal. Rptr. 2d 158 (Cal. Ct. App. 2002) (lost profits were too speculative in calculation for a business that did not exist); *Sargon Enterprises,* 288 P.3d at 1255 (lost profits too speculative when plaintiff claimed that breach prevented small company from developing into a worldwide leader in its field).

Nevertheless, I cannot simply determine Antech's average variable costs and then apply them directly to Winchester without considering the significant ways in which the evidence has shown that Winchester was not an average client.  I recognize that the average Antech client received a 45% discount off list price, whereas Winchester received a 65% discount.[8] This fact, standing alone, suggests that variable costs would be a higher percentage of the revenue received by Antech from Winchester than it is for the average customer.  Cutting in the other direction are factors like transportation costs that would be lower for Winchester because of economies of scale due to the

---

[8] The average clients in a contract received a 51% discount, but that number is unhelpful here because there was no evidence concerning the average variable cost specifically for servicing clients with contracts.  Rather, the evidence presented concerned overall average variable costs.

relatively large size of the Winchester contract.  These
factors, standing alone, might suggest that the profit margin
would be higher on revenue from Winchester than the average
customer.  Antech did not present any data about the relative
sizes of these two factors, insisting that providing more
individualized information was impossible given the technology,
accounting, and data collection procedure that Antech currently
uses.

While Antech may not have access to the individualized data
about the variable costs relevant to Winchester individually, it
has provided at least some additional information about the
relative discounts that permits a more individualized assessment
of net profits than simply applying the average costs for all of
Antech's customers.  The 30.6% variable costs figure applies to
an average client.  Because a calculation using that percentage
necessarily uses revenue for services from a customer as a
starting point, other things being equal (an assumption
discussed further below), a larger-than-average discount would
mean that any calculation using the 30.6% number would lead to
an artificially deflated account of variable costs.

To determine how much an average client would have had to
pay on laboratory services at the 45% discount rate to get the
same services that Winchester would be able to get with $360,000
at the 65% rate, I first consider what the list price of the

$360,000-worth of services would be.  The complete list price
(rather than the 35% rate at which Winchester paid for services)
would be $1,028,571.[9]  An average client would not pay full
price, however, but rather would pay 55% of the list price given
the average 45% discount, which is $565,714.[10]

The average variable cost rate of 30.6% applied to an
average client purchasing the same amount as Winchester agreed
to purchase under the contract results in variable costs of
$173,108.[11]  Subtracting the variable costs that would have been
paid by an average client from the outstanding balance due to
Antech, $278,473, would lead to a determination that lost
profits were $105,365.[12]

There is reason to believe, based on Brown's testimony at
trial, that transportation costs as a percentage of revenue for
a larger client like Winchester would be "a little bit lower"
than for the average client, other things being equal.  Brown
stated that transportation costs as a percentage of revenue
would be lower, but said that he did not know if "a little bit
lower" is correct.  Brown did not take any discount related to

---

[9] This calculation is 360,000 = .35(x), where (x) is the list
price.  360,000/.35 = 1,028,571.  Note that these calculations
use only the dollar value, excluding cents.
[10] This calculation is .55 (1,028,571) = 565,714.
[11] Rather than $85,212 in Brown's original calculation.
[12] These numbers are equivalent to finding the variable cost rate
for Winchester to be approximately 62%.

size or economies of scale into account when he created his
model of variable costs.  As Brown acknowledged, leaving out
information about leveraged efficiency results in a conservative
estimate of lost profits.  Although leaving out any leveraged
efficiencies would result in a conservative estimate, using
conservative inputs does not make a lost profits calculation
unreliable.  *See, e.g., Chinese Yellow Pages* v. *Chinese Overseas
Mktg. Serv. Corp.*, 2007 WL 2367800, at *9 (Cal. Ct. App. Aug.
21, 2007) (using conservative estimates to determine lost
profits); *W. Pet Wholesalers, Inc.* v. *Natura Pet Products, Inc.*,
2005 WL 1925858, at *5 (Cal. Ct. App. Aug. 11, 2005)(same).
Given that it is Antech's burden to present evidence of a
reasonably certain calculation of loss, using a conservative
calculation that disregards potential benefits to Antech where
they are insufficiently supported by evidence is appropriate.

> c. *Particular Damages as to the X-Ray Equipment*

I conclude that Antech is not entitled to the full value of
the x-ray equipment, valued at $72,000, in addition to the lost
profits.  Contract damages are designed to compensate a
plaintiff for its lost expectation interest, the "benefit of the
bargain that full performance would have brought." *New W.
Charter Middle Sch.* v. *Los Angeles Unified Sch. Dist.*, 114 Cal.
Rptr. 3d 504, 515 (Cal. Ct. App. 2010).  If Winchester had fully
performed, Antech would have forgiven the amount it paid for the

x-ray equipment.  If Antech were allowed to recover both the value of the equipment and the lost profits, this would essentially be double recovery and Antech would improperly receive more than its due.  *Accord Antech Diagnostics, Inc.* v. *Downers Grove Animal Hosp. & Bird Clinic, P.C.*, 2013 WL 773034, at *8 (N.D. Ill. Feb. 28, 2013) (Antech was not permitted to recover both a loan to the animal hospital designed to be forgiven over the term of the contract as well as lost profits). I conclude that Antech may not recover additional damages for the value of the x-ray equipment.[13]

> ### d. Remedy for Breach of Exclusivity

Antech focused its lost profits damages analysis on Winchester's breach in not meeting the minimum commitments. Winchester also breached the Agreement in an additional way, through failing to use Antech on a near-exclusive basis as required by the Agreement.  This additional breach, however, does not add any additional damages to a lost-profits analysis under the evidence presented at trial.  Antech has not presented any evidence that Winchester would have ultimately gone over the minimum amount during the five year period such that the

---

[13] Even the $1 additional fee to keep the equipment as noted in Section 5 is not owed if Winchester pays the expectation damages under the Agreement, because Winchester would have been entitled to keep the equipment without any extra payment if it had performed under the Agreement.

expected revenue would be greater than $360,000.  Winchester's track record during the period that it performed suggests the opposite.  Brown testified that Winchester had only met its monthly average minimum for a single month, and other than that had bought less than $6,000 of services per month during the period that they were performing.  There is no evidence that Winchester was violating the near-exclusivity requirement during the period that it was not making the monthly minimums.  Under the Agreement, Winchester was entitled to an additional year to meet the minimum services price of $360,000 and as of February 2011 it appeared that unless they significantly increased the quantity or price of services they ordered, they were on track to need the extra time.  In the absence of any evidence that Winchester would have exceeded the $360,000 minimum, the lost profit analysis based on the minimum commitment remains the appropriate measure of damages.

    4.    Reliance Damages

    If the lost profit analysis were found to be inadequately certain, Antech would still be entitled to reliance-based damages in the alternative.  Reliance-based damages include "expenditures made in preparation for performance or in performance."  Restatement Second of Contracts, § 349.

    Antech contends that its expenditures and services provided to Winchester are the value of the x-ray equipment plus the

discounts and rebates that it provided to Winchester.  Antech
calculates that the value of the discounts and rebates off list
price amount to $151,939.09.  There was significant evidence at
trial, however, that list price is an inflated value and there
are no circumstances under which Winchester would have paid list
price.  For example, Brown testified that the average discount
for all customers was 45%.  Hayes testified that from the
beginning of Antech's negotiations with Winchester, they were
discussing whether Antech would match the prices then being
offered by IDEXX to Winchester without any contract.  He
testified that there was never any discussion about Winchester
paying list price or paying more than they were then paying with
IDEXX.  Dr. Zanotti testified that even without any contract,
Winchester had always received discounted pricing from both
Antech and IDEXX.  He testified that Antech's discounts were
equivalent to the discounts they were receiving from IDEXX at
the time they entered the Agreement.[14]  Antech did not actually
expend any money to provide the discounts and rebates to
Winchester.  In fact, even with the significant discounts, it
made a profit on the services that Winchester purchased from it

---

[14]    The testimony of Dr. McCammon, on which I place little
weight, provides some additional evidence that Antech regularly
offered discounts to its customers.

pursuant to the Agreement.  The entire Agreement was structured

to incentivize Winchester to bring its business to Antech rather

than IDEXX at the discounted price that it was already paying to

IDEXX.  The evidence at trial showed that the incentive was the

x-ray machine, not the discounted rate.  Given the evidence at

trial, the full list prices are not an accurate measure of the

value of the services provided by Antech to Winchester and the

discounts and rebates are not an accurate measure of money

expended by Antech to secure the contract.

The x-ray equipment, in contrast, was an expenditure by

Antech that was made in reliance on Winchester's commitment to

the Agreement.  The full value of the x-ray equipment, $72,000,

is the expenditure made by Antech in reliance on the Agreement

and would therefore be awarded to Winchester as reliance-based

damages if the lost profit calculation were insufficient.  No

additional expenditure was made to secure the requirement that

Winchester use Antech on a near-exclusive basis, so this

additional breach does not add anything to an assessment of

reliance-based damages.

    5.   Prejudgment Interest

California provides mandatory prejudgment interest when a

party is entitled to recover damages certain, Cal. Civ. Code

§ 3287(a), and discretionary prejudgment interest when a party

is entitled to receive damages "based upon a cause of action in

contract where the claim was unliquidated," *id.* at § 3287 (b).

Antech has moved for discretionary prejudgment interest under

section (b).  The California statutory prejudgment interest rate

for contracts is 10 percent per annum.  *Id.* at § 3289.  This

calculation may run, in my discretion, from as early as the date

the action was filed.

Winchester argues that no prejudgment interest is

appropriate when a debtor was prevented by the act of the

creditor from paying the debt.  *Id.* at § 3287(a).  Since it

attempted to pay Antech $57,600 in October 2011 and the offer

was rebuffed, Winchester contends that no prejudgment interest

is appropriate, at least on $57,600 of the total damages amount.

Winchester's attempt to pay the amount in Section 5 of the

Agreement, however, does not take this amount out of

consideration for purposes of prejudgment interest.  First, the

argument that a party was prevented from paying its debt applies

only to cases that fall under § 3287(a), in which the amount

owed is certain, as in a liquidated damages provision.  Here, I

have determined that Antech is entitled to its expectation

damages related to this contract, not merely to the amounts

specified in Section 5.  This has required a detailed analysis

of Antech's net profits, as discussed above.  The amount owed

was not, therefore, a certain amount as required under §

3287(a), so the exception for § 3287(a) similarly does not

apply.   In addition, a tender of less than the full amount due

on the contract does not stop the running of interest, "since a

tender, in order to be effective, must include everything to

which the creditor is entitled."  *Lovetro* v. *Steers*, 44 Cal.

Rptr. 604, 615 (Cal. Dist. Ct. App. 1965).[15]

   The purpose of prejudgment interest under California law

"is to provide just compensation to the injured party for loss

of use of the award during the prejudgment period — in other

words, to make the plaintiff whole as of the date of the

injury."  *Lakin* v. *Watkins Assoc. Indus.*, 863 P.2d 179, 191

(Cal. 1993).  Prejudgment interest is an element of damages, *see*

*North Oakland Med. Clinic* v. *Rogers*, 76 Cal. Rptr. 2d 743, 747

(Cal. Ct. App. 1998), and damages for breach of contract are

---

[15] Antech has presented the additional argument that the offer of
the $57,601 was conditioned on that payment being accepted by
Antech as a full and final payment of all amounts due from
Winchester to Antech.  To support this position, Antech
submitted an October 27, 2011 letter that had not previously
been admitted at trial.  Winchester cites *American Cyanamid Co*.
v. *Capuano*, 381 F.3d 6, 28-29 (1st Cir. 2004) to support the
argument that evidence related to calculation of prejudgment
interest may be submitted post-trial.  Winchester counters that
this is improper, and that *American Cyanamid* stands only for the
proposition that a prevailing party can submit evidence
"regarding accrual dates and numbers required to calculate
interest."  *Id*. at 28.  Even putting the October 27th
letter
aside, there is evidence in the record that Doctors Zanotti and
Diehl offered the $57,601 as what they believed was the
termination fee they would need to pay to get out of the
contract.  I need not resolve whether I may consider the October
27th letter, since it is apparent for a number of reasons that
the tender of the $57,601 did not preclude the accrual of
otherwise-proper prejudgment interest.

meant to be "the amount which will compensate the party
aggrieved for *all* the detriment proximately caused thereby, or
which, in the ordinary course of things, would be likely to
result thereform."  Cal. Civ. Code § 3300.  Antech argues that
Winchester's breach of contract deprived Antech of its
bargained-for consideration, the agreed-to minimum yearly
payments, for more than three years, and that the interest on
the full amount owed as of the date of the filing of the action
is the appropriate way to fully compensate Antech for the amount
withheld from it through Winchester's breach.

In contrast, Winchester argues given that the contract
provided for yearly minimum purchases, any prejudgment interest
should be calculated only from the date on which the payments
would have been due under the contract.  In *Currie* v. *Workers'
Compl Appeals Bd.*, 17 P.3d 749 (Cal. 2001), the Supreme Court of
California explained that where a plaintiff was suspended from
work that would have paid a salary over time, the plaintiff was
entitled to the "benefit of the moneys paid as of those dates."
*Id*. at 754 (quoting *Mass* v. *Board of Ed.,* 394 P.2d 579, 588
(Cal. 1964)).  To make the plaintiff whole, the court determined
that he must be paid interest as of the days he would have
received the salary, because otherwise he would have "lost the
natural growth and productivity of the withheld salary in the
form of interest."  *Id.*

42

Similarly, Winchester argues that Antech should be entitled
to interest from the date on which it would have received
compensation under the contract, but not for the full value of
the contract as of the date the suit was filed, December 1,
2011.  Under Winchester's argument, giving prejudgment interest
for the full amount to Antech as of the date the suit was filed
would be overcompensating Antech because the contract did not
require the full $360,000 be paid as of that date.  Antech notes
that *Currie* concerns compensation under Cal. Civ. Code
§ 3287(a), whereas Antech seeks compensation under § 3287(b),
but I do not find that the reasoning concerning when prejudgment
interest is appropriate should be any different under one
section of the statute rather than another.  Given the purposes
of prejudgment interest, to make the plaintiff whole, it would
be improper for Antech to receive the benefit of interest on
payments that it would not yet have received under the terms of
the contract.

Where there is no prior agreement about the terms under
which interest will be owed, the general rule is that "the law
awards interest upon money from the time it becomes due and
payable, if such time is certain and the sum is certain or can
be made certain by calculation." *Indem. Ins. Co. of N. Am.* v.
*Watson*, 16 P.2d 760, 765 (Cal. Ct. App. 1932).  Neither Antech
nor Winchester proposes what such a prorated prejudgment

43

interest schedule would look like given the terms of this
contract.  The Agreement, which states that it is for a term of
60 months, under a section titled "minimum average annual fees"
required Winchester to use Antech to provide laboratory services
"in an amount equal to a minimum of $72,000 or a $6,000 net per
month average."  However, at Winchester's request, the contract
also stated, "If total lab payments have not reached $360,000
within the 60 month term Antech will extend the term for an
additional 12 months."  Therefore, while the contract
anticipated an annual minimum that came out to a certain average
per month, the contract also provided that Winchester would have
an entire sixth year to make up any shortfall in the contract
amount.  Given that the Agreement ran from September 15, 2009,
the six-year period (the 60 months plus the additional 12
months) would not expire until September 15, 2015.  Under the
Agreement, Antech would not have had a cause of action against
Winchester solely for not meeting the minimum payments until the
expiration of the additional year.  Of course Antech could have
terminated the agreement for Winchester's violation of the
exclusivity provision, but it chose not to do so by not
exercising its right to the payment schedule in Section 5.

Given the plain terms of the contract, I deny prejudgment
interest entirely because the contract would not have required
payment of the full amount until mid-September 2015.  Antech

must suffer the consequences of drafting a contract without firm dates by which payment was due.

### III. ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby ORDERED that judgment enter for the plaintiffs on the basis of these findings of fact and conclusions of law and that damages be awarded to Plaintiffs as lost profits in the amount of $105,365; no prejudgment interest is awarded.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE